William Todd CHILDRESS, By and Through his parents, Ira CHILDRESS and Joyce Childress, and Ira Childress and Joyce Childress, individually, Plaintiffs-Appellants,

v.

MADISON COUNTY, Tennessee, the Madison County Board of Education, and the Young Men's Christian Association, Jackson, Tennessee, a/k/a Y.M.C.A., Defendants-Appellees.

Court of Appeals of Tennessee,
Western Section, at Jackson.

Jan. 24, 1989.

Permission to Appeal
Denied by Supreme Court
Aug. 7, 1989.

David Hardee and Linda L. Moore, Jackson, for plaintiffs-appellants.

J. Tim Edwards, Glassman, Jeter & Edwards, Memphis, for defendants-appellees.

HIGHERS, Judge.

The plaintiffs, Ira Childress and Joyce Childress, brought this action individually and on behalf of their son, William Todd Childress, against Madison County and the Madison County Board of Education, alleging negligence which proximately caused personal injury to their son, a mentally handicapped student in Special Education at South Side High School. After a bench trial, the court found that the evidence did not preponderate in favor of the contentions of the plaintiffs. Plaintiffs are appealing from a judgment for the defendants.

At the time of the accident, William Todd Childress was a twenty-year old, nonverbal, severely retarded student. He traveled regularly with his class to the Y.M.C.A. to use recreational facilities, including a swimming pool.[1] The trips were supervised by a teacher and an aide, both employees of Madison County, and while at the pool, by a lifeguard employed by the Y.M.C.A.

Some of the trips were to allow students to train for the Special Olympics. Childress' event consisted of walking the width of the shallow end of the swimming pool and handing a floating ball to an attendant.

On April 11, 1984, near the end of one of these training excursions to the Y.M.C.A., Childress was found on the floor of the pool at the point where the pool slopes from the shallow to the deep end. He was retrieved by the lifeguard and, after resuscitation began to breathe. He expelled water, vomited, and coughed, but otherwise appeared normal. An ambulance was called and Childress was taken to the hospital and admitted. Childress sustained injuries and incurred medical expenses as a result of this incident.

1. The Y.M.C.A. was originally a party defendant, but was dismissed before trial and is not involved in this appeal.

The teacher testified that there were three people who were responsible for observing the class—the teacher, the aide, and the lifeguard. The teacher testified that she was at the shallow end of the pool, the aide was on the other side of the pool, and the lifeguard was in and out of the pool at various points while offering instruction to students.

On this occasion the teacher stated that she was working with Childress. She described the events leading to the accident as follows:

Q. And toward the end of that hour what specifically were you doing with the children?

A. Well, the last thing that I did before I got out of the pool was work with Todd going back and forth across the pool.

Q. He would be walking back and forth across the pool?

A. Yes.

Q. And when you ceased that activity, what did you do?

A. I told Todd to get out of the water and told all of the other children to get out of the water.

Q. Did Todd get out of the water?

A. I did not see Todd get out of the water. As the children were exiting the pool another student jumped in at the shallow end, who was a swimmer, to swim a lap and I walked along the edge of the pool as he swam to the deep end.

Q. Did you ever again see Todd after you told him to get out of the pool until he was found underwater?

A. No.

\*   \*   \*   \*   \*   \*

Q. Do you know who was watching Todd?

A. No.

Q. Do you know if anybody was watching Todd?

A. We all had joint responsibility for watching the students.

Q. Do you know if anyone was watching Todd as he was getting out of the pool?

A. I would have no way of knowing.

In light of the testimony, we are of the opinion that the evidence preponderates against a finding of no negligence. In non-jury matters the findings of fact of the trial court come to this court with a presumption of correctness and are reviewed *de novo*. Unless the evidence preponderates against the findings, we must affirm. T.R.A.P. 13(d). The trial court's judgment in this case indicates that he found no negligence on the part of Madison County or the Madison County Board of Education. The proof shows, however, that the teacher and the aide were responsible for watching the students; that the teacher ordered students out of the pool, but did not actually see Childress exit; that she became involved in observing another student, and did not know whether Childress left the pool; and that she did not know whether anyone was watching Childress during the crucial period when he apparently went into water that was over his head, thereby sustaining the injuries and damages which gave rise to the complaint. It further appears that each of the attendants was involved in small group instruction and that no one actually scanned the pool in order to see whether the group as a whole had obeyed the instructions to leave the area. But for the fact that no one watched the pool without the distractions of other instruction, Childress would not have been injured.

Under these circumstances, we cannot say that plaintiffs have failed to make out a case by the greater weight or preponderance of the evidence.

The defendants have raised a further issue in this case, however, that the mother executed a release of all liability of these defendants. It is their contention that even if they were guilty of negligence the action is barred by the release of claims executed by the mother individually and on behalf of her son.

It is well settled in this state that parties may contract that one shall not be liable for his negligence to another but that such other shall assume the risk incident to such negligence. *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960). This

rule is subject to exception. A party cannot contract away his liability for willful or gross negligence. *Memphis & Charleston Railroad Co. v. Jones*, 39 Tenn. (2 Head) 517 (1859). Neither can a party contract away liability if the duty under which he acts is a public one. *Cincinnati, New Orleans & Texas Pacific Railway Co. v. Saulsbury*, 115 Tenn. 402, 90 S.W. 624, 626 (1905); *Carolina, Clinchfield & Ohio Railway Co. v. Unaka Springs Lumber Co.*, 130 Tenn. 354, 170 S.W. 591, 594 (1914); *Hartford Fire Insurance Co. v. Chicago, Milwaukee & St. Paul Railway Co.*, 175 U.S. 91, 20 S.Ct. 33, 44 L.Ed. 84 (1899).

■ The existence of a public duty which would disallow giving effect to an exculpatory provision is determined by looking at several factors. If the service provided is the type which may generally be subject to public regulation then the duty probably exists. *Smith v. Southern Bell*, 364 S.W.2d at 958. Other factors include the degree to which the service is of practical necessity for some members of the public, whether the service is offered to any member of the public who seeks it or qualifies for it, whether one party has greater bargaining power than members of the general public, whether in exercising that bargaining power, the party presents a standardized "adhesion" contract making no provision whereby protection against negligence may be obtained, or whether the person or property of one party is placed under the control of the other. *Olson v. Molzen*, 558 S.W.2d 429, 431 (Tenn.1977) (adopting the rule of *Tunkl v. Regents of University of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963)). Particularly offensive in Tennessee are exculpation contracts executed by persons in professional vocations. *Olson*, 558 S.W.2d at 432.

■ Persons and businesses which normally operate under a public duty are not bound by the exception and can execute valid exculpation contracts when the transaction in question is not under that public duty. Thus it has been held that a telephone company can execute such a contract as to its advertising services, *Smith v. Southern Bell*, 364 S.W.2d 957–958, *citing Mitchell v. Southwestern Bell Telephone Co.*, 298 S.W.2d 520 (Mo.App.1957), and a common carrier may contract against liability when executing a lease agreement, *Cincinnati, N.O. & T.P.R. Co. v. Saulsbury*, 90 S.W. at 626.

■ Analyzing the facts of this case under the foregoing rules, we find that the Special Olympics generally, and the services provided in this case specifically, are governed by the general rule and do not fall under the exception prohibiting exculpatory clauses. Although there are a number of circumstances which would otherwise bring the Special Olympics under the exceptions related to professional or public services, our analysis of all the cases cited reveals that the rule was intended to operate primarily in the marketplace. The *Olson* opinion in analyzing the public duty exception refers to "business," "bargaining strength" in "economic settings," "purchasers," and payment of "additional fees to obtain protection against negligence" implying that there were fees in the first place. We are not here saying that the touchstone of the analysis is the existence or absence of business motivations, or pecuniary exchange. But when those considerations which are tied to economic factors are eliminated from the analysis, in this case by the absence of any business motivations, the remaining factors are insufficient to bring this case under the exception. Having determined that the exculpatory clauses are generally valid as to the Special Olympics, we look now to the provisions of the clause used in this case.

The exculpatory language in this case is a part of a form document entitled "Tennessee Special Olympics Parental/Medical Release Form." It is printed on an 8½″ × 11″ sheet divided into three sections, the right half of the page being a medical release to be completed by a physician or registered nurse. The left half of the page is divided into two sections, the top being for completion by parents or teachers requiring statistical date such as age, clothing sizes, and addresses of the participant.

The bottom section is entitled "Parent/Guardian Release." As completed in the case at bar, the release is as follows:

### Parent/Guardian Release

Participation:

I hereby give permission for the entrant named above to participate in the Special Olympics program—a sports-training, recreation, and competitive athletic program for mentally retarded children and adults.

Medical:

I represent and warrant to you that the entrant is physically and mentally able to participate in Special Olympics, and I submit herewith a subscribed medical certificate.

Consent to Treatment:

You are authorized on my behalf and at my account to take such measures and arrange for such medical and hospital treatment as you may deem advisable for the health and well-being of the entrant without the need for further consent or permission.

Release of Claim:

I, the undersigned, individually and on behalf of the above-named entrant, acknowledge that the entrant will be using facilities at his/her own risk. I, on my own behalf, hereby release, discharge and indemnify Special Olympics, its directors, officers, employees, physicians, agents, and all volunteer personnel from all liabilities for damage, injury or illness to the entrant or his/her property during his/her participation in or travel to or from any Special Olympics event. (Emphasis Supplied)

Permission to Publish:

Permission is hereby granted to use the name, likeness, voice and words of the entrant in television, radio, films, newspapers, magazines and other media, and in any form not heretofore described for the purposes and activities of Special Olympics and in appealing for funds to support such activities.

Parent/Guardian/Adult Entrant

Mrs. Ira Childress (subscribed)

Signature

Mother (Handwritten)

Relationship to Entrant

12–18–86 (Handwritten)

Date

The emphasized language is at issue. The trial judge was of the opinion that Mrs. Childress "had executed a document releasing these defendants from liabilities as a result of any injuries that might occur in connection with the Special Olympics program." This conclusion is in part correct.

■ Exculpatory clauses purporting to contract against liability for intentional conduct, recklessness or gross negligence are unenforceable. *See Adams v. Roark*, 686 S.W.2d 73 (Tenn.1985) *Memphis & Charleston Railroad Co., supra.* We find that the defendants in this case have not exceeded the bounds of simple negligence, even in light of the higher standard of care under which they operate due to the students' mental disability. *See* 65A C.J.S. *Negligence* § 141 (1966).

■ The parties in this case are the plaintiffs, Todd Childress, by his parents, and his mother, Joyce Childress, and his father, Ira Childress, individually; and the defendants, Madison County, and the Madison County Board of Education. The defendants were at the time of the incident in question acting through the teacher and her aide as agents or volunteers of the Special Olympics. The incident occurred during a Special Olympics training session, which the evidence shows was a "Special Olympics event" within the meaning of that phrase as used in the release form. While the evidence did show that there had been trips to the Y.M.C.A. pool which were independent of Special Olympics training, it is clear that the objective of this particular trip was to train for the Special Olympics and during this trip the teachers acted within the purview of duties they assumed as agents and/or volunteers of Special Olympics. Therefore, any liability for any actions taken must be analyzed as the actions of agents or volunteers of the Special Olympics as governed by the release form.

The plaintiffs assert on appeal that the evidence established that Mrs. Childress had signed a number of "permission slips" and that in executing the release form, Mrs. Childress thought that she was merely signing another permission slip. We find this assertion unsupportable by the evidence. The evidence shows that the permission slips which Mrs. Childress signed were mimeographed copies of a handwritten form. The release form was not mimeographed and was copied from a printed document—not handwritten, not even typed. Besides the difference facially, the content of the release is very different from the content of the permission slips. Mrs. Childress signed the document, and cannot, under these circumstances assert she thought she was signing a permission slip and not a release. Even if that were a valid assertion, it would make no difference in the outcome of the case. Although notice of an exculpatory clause is a prerequisite to its validity, *Dodge v. Nashville Chattanooga & St. Louis Railway Co.*, 142 Tenn. 20, 215 S.W. 274 (1919), a party's failure to read does not constitute a lack of notice to that party, *Dixon v. Manier*, 545 S.W.2d 948, 949 (Tenn.App.1976).

Of the plaintiffs, only Mrs. Childress, Todd's mother signed the release form. The language, quoted above, is clear and unambiguous. Mrs. Childress acknowledged that Todd would be participating at his own risk. She further agreed to "release, discharge and indemnify Special Olympics, its ... agents, and all volunteer personnel." Therefore, the trial judge was correct in dismissing this case as to Mrs. Childress individually.

Mr. Childress did not himself sign the release form and there is no indication in the language of the form or in the manner in which Mrs. Childress signed that she did in fact, or was even authorized to, release or discharge the Special Olympics on Mr. Childress' behalf. However, Mrs. Childress did clearly agree to indemnify the Special Olympics "from all liabilities for damage, injury or illness to the entrant or his/her property during his/her participation in or travel to or from any Special Olympics event." Therefore, to the extent the defendants are liable to Mr. Childress, Mrs. Childress, as indemnitor, must compensate him.

Neither did the remaining plaintiff, Todd Childress, sign the release form himself. Had he done so, being an incompetent, incapable of understanding the nature of his action, the execution could not be given effect. *See* 44 C.J.S. *Insane Persons* § 49 (1945). But, according to the language of the release, Mrs. Childress, as his mother and natural parent, acknowledged on Todd's behalf that he would be participating at his own risk.

The status of guardians of incompetent persons is similar to that of guardians of infants, especially in view of courts of equity. *Id.* The general rule is that a guardian may not waive the rights of an infant or an incompetent. 39 Am.Jur.2d, *Guardian & Ward* § 102 (1968); 42 Am. Jur.2d, *Infants* § 152 (1969). Specifically, the Supreme Court of Tennessee long ago stated that a guardian cannot settle an existing claim apart from court approval or statutory authority. *Miles v. Kaigler*, 18 Tenn. (10 Yerg.) 10 (1836). *Spitzer v. Knoxville Iron, Co.*, 133 Tenn. 217, 180 S.W. 163 (1915). *Tune v. Louisville & Nashville Railroad Co.*, 223 F.Supp. 928 (MD Tenn.1963). It has also been held that a guardian may not waive the statutory requirements for service of process on an infant or incompetent by accepting service of process on himself alone. *Winchester v. Winchester*, 38 Tenn. (1 Head) 460 (1858).

The courts of other states have recognized this general rule in a number of circumstances including those cited above. *See e.g. Gibson v. Anderson*, 265 Ala. 553, 92 So.2d 692, 695 (1956) (legal guardian's acts do not estop ward from asserting rights in property); *Ortman v. Kane*, 389 Ill. 613, 60 N.E.2d 93, 98 (1945) (guardian cannot waive tender requirements of land sale contract entered into by ward prior to incompetency); *Stockman v. City of South Portland*, 147 Me 376, 87 A.2d 679 (1952) (guardian cannot waive ward's property tax exemption); *Sharp v. State*, 240 Miss. 629, 127 So.2d 865, 90 A.L.R.2d 284 (1961)

(guardian cannot waive statutory requirements for service of process on ward); *Jones v. Dressel*, 623 P.2d 370 (Colo.1981) (ratification by parent of contract executed by child does not bind child); *Whitcomb v. Dancer*, 140 Vt. 580, 443 A.2d 458 (1982) (guardian cannot settle personal injury claim for ward without court approval); *Natural Father v. United Methodist Children's Home*, 418 So.2d 807 (Miss.1982) (infant not bound by evidentiary admissions of parent); *Colfer v. Royal Globe Ins. Co.*, 214 N.J.Super. 374, 519 A.2d 893 (1986) (guardian cannot settle personal injury claim for ward without court approval).

In Mississippi, the rule was expressed in broad terms by the Supreme Court in *Khoury v. Saik*, 203 Miss. 155, 33 So.2d 616, 618 (1948): "Minors can waive nothing. In the law they are helpless, so much so that their representatives can waive nothing for them." *See also Parker v. Smith*, 150 Miss. 849, 117 So. 249, 250 (1928).

The Supreme Court of Connecticut has specifically held that an agreement, signed by one of the parents of a minor as a condition to his being allowed to attend a camp, waiving the minor's claims against a camp for damages in the event of an injury was ineffective to waive the rights of the minor against the defendant camp. *Fedor v. Mauwehu Council, Boy Scouts of America, Inc.*, 21 Conn.Sup. 38, 143 A.2d 466, 468 (1958). The Supreme Court of Maine reached the same conclusion in *Doyle v. Bowdoin College*, 403 A.2d 1206, 1208 n. 3 (Me.1979). In *Doyle*, the court held that if the agreement in question were a release, it would be ineffective because a parent cannot release the child's action.

█ We believe the rule stated above is in keeping with the protection which Tennessee has afforded to the rights of infants and minors in other situations. We, therefore, hold that Mrs. Childress could not execute a valid release or exculpatory clause as to the rights of her son against the Special Olympics or anyone else, and to the extent the parties to the release attempted and intended to do so, the release is void.

█ The indemnity provisions of the release are on a similar footing. Indemnification agreements executed by a parent or guardian in favor of tort feasors, actual or potential, committing torts against an infant or incompetent, are invalid as they place the interests of the child or incompetent against those of the parent or guardian. *See Valdimer v. Mt. Vernon Hebrew Camps, Inc.*, 9 N.Y.2d 21, 210 N.Y.S.2d 520, 172 N.E.2d 283, 285 (1961). "Clearly, a parent who has placed himself in the position of indemnitor will be a dubious champion of his infant child's rights." *Id. See also Ohio Casualty Insurance Co. v. Mallison*, 223 Or 406, 354 P.2d 800, 802–803 (1960). We are aware that the indemnity agreements in the two cases just cited were executed after the cause of action had arisen. This fact does not change the rule, and indemnity provisions executed by the parent prior to a cause of action in favor of a child cannot be given effect. Were the rule otherwise, it would circumvent the rule regarding exculpatory clauses and the policy of affording protection in the law to the rights of those who are unable effectively to protect those rights themselves.

We do not deny that there are good and logical reasons for giving effect to exculpatory and indemnification clauses executed by parents and guardians on behalf of infants and incompetents. Risk is inherent in many activities that make the lives of children richer. A world without risk would be an impoverished world indeed. As Helen Keller well said, "Security is mostly a superstition. It does not exist in nature, nor do the children of men as a whole experience it. Avoiding danger is no safer in the long run than outright exposure. Life is either a daring adventure or nothing." Partnow, *Quotable Woman*, 173 (1977). Ultimately, this case is a determination of who must bear the burden of the risk of injury to infants and minors.

It is not our intention, nor do we feel the result of this case will be, to put a chill on activities such as the Special Olympics. The law is clear that a guardian cannot on behalf of an infant or incompetent, exculpate or indemnify against liability those

organizations which sponsor activities for children and the mentally disabled. If this rule of law is other than as it should be, we feel the remedy is with the Supreme Court or the legislature.

The judgment of the trial court is affirmed as to Joyce Childress individually, and her case is dismissed. As to Ira Childress individually, and William Todd, by and through his parents, Ira Childress and Joyce Childress, this case is reversed and remanded for such further proceedings as may be required. Costs on appeal are assessed against appellees.

TOMLIN, P.J. (W.S.) concurs separately.

NEARN, Special Judge, concurs.

TOMLIN, Presiding Judge (Western Section), concurring.

I readily concur in the excellent opinion written by my colleague. In addition, I would hold that even if the law in this state was to the effect that Mrs. Childress could execute a valid release as to the rights of her son, the release, as executed, as I interpret it, attempts to release only the mother's rights and not those of her son. For instance, the first sentence, acknowledging that young Childress was using the facilities at his own risk, begins with the language: "I, the undersigned, individually *and* on behalf of the above-named entrant...." [emphasis added] However, the language purporting to release the Special Olympics and others reads as follows: "I, *on my own behalf,* hereby, release, discharge and indemnify...." [emphasis added] It is obvious that the language last used purports only to release the rights of the "undersigned," i.e., Mrs. Childress, and not those of her handicapped son.